Blufford HAYES, Jr., Petitioner–
Appellant,

v.

Jeanne WOODFORD, Respondent–
Appellee.

No. 99–99030.

United States Court of Appeals,
Ninth Circuit.

Argued June 6, 2002.

Submitted June 14, 2002.

Filed Aug. 26, 2002.

David A. Senior, McBreen & Senior, Los Angeles, California, argued the cause for the petitioner-appellant; Kathleen T. Saenz, McBreen & Senior, Los Angeles, CA, was on the briefs.

Mathew Chan, Deputy Attorney General, Sacramento, California, argued the cause for the respondent-appellee; Bill Lockyer, Attorney General, Robert Anderson, Chief Assistant Attorney General, Jo Graves, Senior Assistant Attorney General, Arnold O. Overoye, Senior Assistant Attorney General, Ward A. Campbell, Supervising Deputy Attorney General, and Carlos A. Martinez, Supervising Deputy Attorney General, were on the brief.

Before: O'SCANNLAIN, RYMER, and THOMAS, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Partial Concurrence and Partial Dissent by Judge THOMAS.

O'SCANNLAIN, Circuit Judge.

In this death penalty habeas case, we must decide whether counsel rendered ineffective assistance by failing to present potentially mitigating evidence at the trial's penalty phase. We also consider numerous other claims, including whether the prosecution's failure to reveal evidence that could have been used to impeach a witness had a material effect on the jury's verdict.

I

On the afternoon of January 1, 1980, Blufford Hayes Jr.'s sister, Barbara Lord,

returned to her room at the Rice Motel in Stockton, California and found the resident hotel manager, Vinod "Pete" Patel, lying dead on the floor in front of the bathroom, his hands and feet bound by coat hanger wire.

When Lord had left Room 15 that morning, Hayes, who was staying with her, was the only person in it; he was wearing a dark blue three-piece suit and a light blue, long-sleeved shirt. Later, at 9:30 a.m., Bearla Mae Wyatt, another motel resident, went to the motel office to request fresh towels. In the office, she saw Hayes complaining to Patel about a problem with the bathroom sink in Room 15.[1] Patel did not understand Hayes's explanation and invited Hayes to demonstrate what he meant in Patel's own living quarters, which adjoined the office. Because Patel was occupied, Wyatt left; when she returned 10–15 minutes later, Hayes and Patel were coming out of Patel's bathroom area. Patel told Hayes that he would come to Room 15 to check the sink.

Soon thereafter, Michele Gebert, who lived at the Rice Motel with Andrew "A.J." James, was awakened by knocking at her door. Upon opening it, she found Hayes, wearing a dark blue suit coat and matching pants, but no shirt or vest. There were wet spots on the suit coat, and his hands were "messed up." He seemed to be nervous and told Gebert that he wanted James to give him a ride. His speech was coherent, and he did not appear to be under the influence of drugs or alcohol. Gebert awakened James, who went into the bathroom to get ready. While Hayes

waited, he told Gebert about having just "ripped the office off," but he was not worried about Patel reporting the theft because Patel "would not say anything to anybody." He kept yelling at James to "hurry up." Hayes then left with James.

About thirty minutes after having left the motel office and seeing Patel, Wyatt looked out the window of her room and saw Hayes carrying a box across the motel parking lot to a car. James was standing against the car as defendant walked toward it. When James got into his car with Hayes, he saw two boxes of cigarette cartons in the backseat. Hayes said he had to go to his mother's house and urged James to "hurry up." James observed dark stains on Hayes's suit jacket and that the back of his right hand was swollen, "like he had been in a scuffle." When James asked what happened, Hayes replied that he had "offed" Patel because Patel had awakened him and "swung on [Hayes]" so he "just did the do with him." He said that he had torn up the motel office looking for money and had found 22 or 23 $1 bills; James later saw about that many $1 bills in Hayes's possession when he gave James $3 for gas. Hayes asked James if he knew where to get rid of the cigarettes, but James said he did not. James kept one carton for himself, however.

James drove Hayes to his mother's house, helped unload the cigarettes, and then drove straight back to the motel, where he noticed that the door of the motel office was open. He left in the car

---

1. Hayes used to be a resident of the motel himself, but he had been involuntarily checked out when he stopped paying rent. Days earlier, Patel asked the police to arrest Hayes for trespassing because he had broken into his former room. Officers found Hayes in his former room with fresh needle marks on his arm; he admitted to breaking in, but said he intended to pay rent as soon as he could. The police arrested him for trespassing and being under the influence of a controlled substance. Hayes testified at his trial that he had not broken into the room, but rather climbed through the window after finding a new lock on the door. He admitted to being under the influence of heroin at the time, however.

with Gebert, and they drove around discussing what to do before they decided to call the police.

When officers arrived at about 1:00 p.m., they found in Room 15: a light blue, long-sleeved shirt and a dark blue vest, both stained with blood; a leather shoulder pouch containing an empty sheath for a fixed-blade knife;[2] and two items, a wine bottle and a paper bag, that bore Hayes's fingerprints. The walls and floor of the bathroom were spattered with blood. The motel office and adjoining manager's living quarters had been ransacked—drawers were pulled out, mattresses had been removed from beds, a lamp was on its side, and various items were strewn about. The cash drawer was empty, and the normal stock of cigarettes was gone. A hunting knife found in the living quarters fit the sheath found in the shoulder pouch in Room 15.

Hayes's and Patel's blood type are identical; the blood on the dark blue vest, light blue shirt, and hunting knife were consistent with this blood type. Patel received at least 22 cutting and stabbing wounds, including three that penetrated his heart and three his lungs. The wounds were caused by a fairly heavy instrument with one sharp and one square edge, which was consistent with the hunting knife found in the manager's living quarters. The coat hanger bindings on Patel's hands and feet did not leave marks on his body, possibly indicating that Patel had not greatly resisted the binding and may have been unconscious at the time. The wounds incapacitated Patel and probably rendered him unconscious in one to two minutes, with

death likely ensuing in five to fifteen minutes.

When Sergeant Bob Davis Wingo arrested Hayes three weeks later in Oregon, Hayes told him that he had left his sister's room around 3:00 a.m. the morning of the murder and had not returned. At trial, Hayes took the stand in his own defense and told a different story. He testified as to his history of drug abuse,[3] and he stated that he had been awake for the entire three days before the murder. He had injected himself with heroin at 9:00 a.m. and 9:00 p.m. of December 31 and 3:00 a.m. January 1, the morning of the murder. He had also injected Ritalin around midnight and was drinking brandy, but he testified that he was not going through withdrawal (because he had built up a tolerance) and was feeling "normal" at the time of the murder.

According to Hayes, after he had reported the leaky sink to Patel, he went to the store to purchase more wine, returned to Room 15, and fell asleep. He was awakened when someone slapped his face; Hayes struck back and opened his eyes to find Patel standing over him with a knife. He reached for Patel, who swung the knife and cut Hayes across his hand. Hayes grabbed Patel and they wrestled; Hayes twisted Patel's arm until he dropped the knife. Hayes picked up the knife, and then Patel reached for a butcher knife that was on a dresser. Fearful, Hayes ran over and starting hitting and stabbing him. Patel hit him on the left side of his body and in his eye,[4] prompting Hayes to back up and allowing Patel to retreat into the

2. Hayes usually carried a small leather shoulder pouch.

3. Hayes testified that by December 1979 he was an "occasional" user of heroin and Ritalin, but he had used more frequently in the past. Both Gebert and James also testified that Hayes used drugs.

4. On the stand, Hayes displayed a one-inch scar below his left collarbone as evidence of a cut he received during his struggle with Patel. There was no corresponding tear in the shirt he had been wearing, he explained, because it had been completely open and dangling from his shoulders at the time.

bathroom. Then, Hayes heard a loud noise from the bathroom; Patel emerged and fell to the floor. Hayes picked up the butcher knife and put it and a bottle of wine in a dresser drawer and uprighted a knocked over chair. Since Patel was still alive, Hayes bound his hands and feet with coat hangers. Hayes removed his shirt and then went to Gebert's and James's room. Hayes testified that after he told James about his struggle with Patel, it was James who went to the manager's office and stole the cigarettes and money. He said that he and James each carried two boxes of cigarettes to the car and then left for his mother's house.

The evidence, however, did not support Hayes's version of events—particularly the condition of Room 15. Almost all of the blood was found in the bathroom, which is inconsistent with Hayes's testimony that the stabbing occurred in the living area of the room. Also, there were no signs of struggle in the living area, but there were such signs in the bathroom, *e.g.*, shower door out of its frame, toppled trash container. As explanation, Hayes testified that he had tidied up the living area before binding Patel's hands and feet. Furthermore, Hayes is 6'1", 185 pounds, Patel was 5'6", with a medium build, which made it less likely that he would purposefully risk physical confrontation with Hayes. Indeed, Patel had previously called the police regarding Hayes's trespass rather then confront him. *See supra* n. 1. Nor was there any reason for Patel to attack Hayes in such a manner. Finally, Wyatt testified that she saw James carrying only a sweater or jacket to the car—not boxes of cigarettes, as Hayes claimed.

On rebuttal, the prosecution called James Cross, who, on January 5, 1980, had an encounter with Hayes at the Flamingo Motel in Stockton, California similar to Patel's encounter with Hayes. At 2:30 a.m., Cross heard a thumping noise coming from the room above, so he yelled for them to quiet down. The noise continued, so he went upstairs. Hayes met him in the upstairs hallway and said, "You're going to apologize to my lady." Hayes pushed Cross into his room, where Cross saw a woman lying on the bed. Hayes hit Cross in the face, head, and body with a pistol and then asked whether he had any money. Cross pulled out a wad of $1 bills, and Hayes told the woman to give him some coat hangers. After binding Cross's hands, Hayes searched his pockets and found $150. He then removed Cross's boots, searched them, and bound his feet.

Hayes told the woman to search Cross's room, but she returned five minutes later after finding nothing of value. Hayes asked Cross for more money, who lied and said that there was money in the office. Hayes pointed the gun at Cross saying, "You gd f! Don't you believe I kill you?", and then fired a shot over Cross into the floor. Hayes gagged Cross with a towel, threw a bedspread over his body, and left with the woman. Hayes's fingerprints were found in the room, and a bullet was embedded in the floor in the spot indicated by Cross. When arrested in Oregon, Hayes denied all involvement in the Cross incident, claiming that he had not been to the Flamingo Motel for more than a year. The prosecution argued that the parallels to the Cross incident further demonstrated that Hayes intended to rob Patel when he assaulted and killed him.

The jury, believing the prosecution's version of events—namely, that Hayes lured Patel to Room 15 with the report of a leaky sink for the purpose of robbing him—convicted Hayes of one count each of robbery, burglary, and first degree murder. It found as special circumstances that the murder was committed in the perpetration of both robbery and burglary. At the penalty phase, the prosecution presented five of Hayes's past robbery and/or

assault victims and the pathologist who had performed an autopsy on a man Hayes had stabbed to death when he was 17. Hayes presented two counselors who had worked with Hayes during his juvenile confinement; they testified that he was a model ward who would adjust well to prison life.

On direct appeal, the California Supreme Court reversed Hayes's robbery conviction and special circumstance, but it upheld the burglary conviction and special circumstance. *People v. Hayes*, 52 Cal.3d 577, 628–29, 276 Cal.Rptr. 874, 802 P.2d 376 (Cal.1990). The California Supreme Court denied his first and second state habeas petitions without opinion. The U.S. Supreme Court denied certiorari. *Hayes v. Cal.*, 502 U.S. 958, 112 S.Ct. 420, 116 L.Ed.2d 440 (1991).

Hayes filed his amended federal habeas petition in August 1995, which asserted 65 claims. The magistrate judge held evidentiary hearings on two of Hayes's claims. Both parties moved for summary judgment on the merits, and the magistrate judge, in three separate findings and recommendations spanning over 200 pages, recommended that the state's motion for summary judgment be granted as to all claims and that the habeas petition be denied. After de novo review, the district court filed an order specifically addressing some of Hayes's claims, adopting the magistrate's thorough findings and recommendations in full, and denying the petition. The district court granted Hayes a certificate of appealability for the arguments he now makes in this timely appeal.

## II

■ Hayes filed this 28 U.S.C. § 2254 petition before the enactment of the Anti-

terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). As such, our review is governed by pre AEDPA standards. *See, e.g., Lindh v. Murphy*, 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Karis v. Calderon*, 283 F.3d 1117, 1126 n. 1 (9th Cir.2002). "On habeas review, state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that [his] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *McKenzie v. McCormick*, 27 F.3d 1415, 1418 (9th Cir.1994) (citation omitted) (quotation marks omitted).[5] Absent a showing of "structural error," Hayes is not entitled to relief unless a constitutional error " 'had a substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

■ At the outset, it is important to remember our role in the system of habeas review. "The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. *Federal courts are not forums in which to relitigate state trials.*" *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) (emphasis added). Principles of comity and federalism require that we respect the "State's interest in the finality of convictions that have survived direct review within the state court system." *Brecht*, 507 U.S. at 635. Indeed,

---

**5.** *See also Brecht v. Abrahamson*, 507 U.S. 619, 636, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ("State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process ..., and state courts often occupy a superior vantage point from which to evaluate the effect of trial error.").

[t]he States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.

*Id.* (quotation marks omitted). Through this lens, then, we proceed to the merits of Hayes's habeas petition.

### III

We first consider Hayes's contention that he was denied effective assistance of counsel at the penalty phase of his trial. There, Hayes's counsel, Leonard Tauman, presented two counselors from the California Youth Authority ("CYA") who had worked with Hayes during his juvenile confinement. They testified that Hayes flourishes in structured environments away from drugs and alcohol. Wayne Amerson, CYA counselor, testified that Hayes was a "model ward" who got along well with others, including the counselors and correctional officers, and was a leader. Hayes was also "a good student" during his time with CYA. Amerson testified that if Hayes was incarcerated, he would "very likely contribute or be a productive" member of the prison population. Amerson's testimony was echoed by David Taylor, retired CYA counselor, who thought that Hayes would "be a profit to some institution" and a "positive" influence on other inmates because of his leadership skills. He testified that Hayes had presented "no problem whatsoever" to CYA authorities and that Hayes's behavior on the streets was in "marked contrast" to his behavior with CYA. By way of demonstration, Taylor testified that when Hayes had responsibility for the kitchen at CYA, he had ready access to "all sorts of weapons," but he never abused the trust placed in him. Hayes offered no other witnesses.

 Hayes argues that Tauman's representation was constitutionally deficient because he failed to investigate and to present potentially mitigating evidence regarding Hayes's family background, drug abuse, and mental health.[6] Under the familiar two-prong test for effective-

---

6. The district court did not hold an evidentiary hearing on this claim because it concluded that Hayes failed to establish a colorable claim of ineffective assistance. Such a hearing is required if "(1) the petitioner's allegations, if proved, would entitle him to relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts." *Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir.1992) (quotation marks omitted). "In a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court." *Siripongs v. Calderon*, 35 F.3d 1308, 1310 (9th Cir.1994). Thus, Hayes must demonstrate that, if proven, his allegation of ineffective assistance would establish both deficient performance and prejudice. A denial of a motion for an evidentiary hearing is reviewed for abuse of discretion. *Karis*, 283 F.3d at 1126.

Hayes also contends that the magistrate improperly granted summary judgment without giving him an adequate opportunity for discovery to pursue his ineffective assistance of counsel claims. On habeas review, "discovery is available only in the discretion of the court and for good cause shown." *Rich v. Calderon*, 187 F.3d 1064, 1067–68 (9th Cir. 1999). Moreover, in order to avoid summary judgment, Hayes must put forth sufficient colorable evidence to raise a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Here, Hayes failed to demonstrate good cause for further discovery. At the time the district court denied him further discovery, he had been represented by Richard Such for over 10 years and the state and federal courts had paid his attorneys over $200,000 in fees and expenses; yet he was unable to present any colorable facts in opposition to the government's summary judgment motion. Thus, the district court did not abuse

ness, established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Hayes must show that Tauman's representation was both deficient and prejudicial. *Id.* at 693.[7] Hayes bears the burden of demonstrating that Tauman's performance was "so deficient that it fell below an 'objective standard of reasonableness.'" *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir.2002) (quoting *Strickland*, 466 U.S. at 688), *petition for cert. filed*, 70 U.S.L.W. 3775 (U.S. June 3, 2002) (No. 01–1779). "Judicial scrutiny of a counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Hayes must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.; see also Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir.2001) (Defendant "bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy."), *cert. denied*, —— U.S. ——, 122 S.Ct. 1313, 152 L.Ed.2d 222 (2002). Counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. More specifically, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

■■■■■ To establish prejudice, Hayes must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694. Or, in other words, but for Tauman's deficient performance, Hayes would not have received the sentence that he did. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.* However, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693 (citation omitted). Thus, the question for us is whether Hayes put forth a colorable claim of deficient performance that prejudiced the outcome of the penalty phase.

■■■■ We recognize "the importance of presenting the available mitigating evidence in order for the jury to fairly make the vital determination of whether the defendant will live or die." *Karis*, 283 F.3d at 1135. Certainly the brevity of Tauman's penalty phase presentation is troubling, *see id.*, but length alone does not render a performance constitutionally inadequate. *See Bell v. Cone*, 535 U.S. ——, 122 S.Ct. 1843, 1854, 152 L.Ed.2d 914 (2002) (upholding dismissal of habeas petition challenging counsel's representation when he did not present any mitigating evidence and waived closing argument). Tauman focused on Hayes's ability to flourish in a structured environment and to benefit the prison population as reasons to spare his life, which, the state argues, was

---

its discretion in denying him further discovery.

**7.** The *Strickland* standard for ineffective assistance of counsel applies to performance at the penalty phase. *E.g., Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir.2002). On habeas review, however, we do not conduct the *Brecht* harmless error analysis because "[t]he *Strickland* prejudice analysis is complete in itself; there is no place for an additional harmless error review." *Jackson v. Calderon*, 211 F.3d 1148, 1154 n. 2 (9th Cir.2000), *cert. denied*, 531 U.S. 1072 (2001).

a reasonable tactical decision, particularly considering Hayes's express request not to involve his family, the absence of any indication that Hayes had mental health problems, and the repeated references during the guilt phase to Hayes's drug abuse.

### A

In examining whether counsel was deficient in failing to offer evidence on family background, we do not allow a defendant's request to refrain from involving his family to excuse counsel's failure to investigate potentially mitigating evidence per se. *See Karis,* 283 F.3d at 1136; *Silva,* 279 F.3d at 840. The client's wishes, however, inform our view of the reasonableness of a particular course of action taken by counsel. The competence of an attorney's decisions made in the course of his representation is entitled to an additional dose of deference if counsel is acting in conformity with the client's wishes. *See Strickland,* 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). *Silva* distinguished counsel's duty to investigate mitigating evidence from the client's request that his family not be called to testify, holding that the mere direction not to *call* certain witnesses to testify does not alleviate counsel's obligation to *investigate.* 279 F.3d at 838–39. *Silva* differs from

this case, however, because, as the magistrate judge found, Hayes made it clear that he did not want his family involved in his defense "either by way of personal testimony *or investigation.*"[8] *Hayes v. Calderon,* No. CIV S–92–0603 DFL GGH P, at 33 (E.D.Cal. May 13, 1998) (findings and recommendations). In fact, Hayes's own habeas petition states that he told Tauman "that he did not want his family involved in the case."

In *Campbell v. Kincheloe,* 829 F.2d 1453 (9th Cir.1987), we did not find counsel's performance inadequate when the petitioner "specifically requested his attorneys not to contact members of his family." *Id.* at 1463. Importantly, however, *Campbell's* attorneys were "well aware of the potential mitigating factors which may have been introduced at the sentencing proceeding" before they acquiesced in their client's wishes. *Id.* Like *Campbell,* Tauman knew of his client's family history and childhood experiences. At an evidentiary hearing held on a different ineffectiveness issue,[9] Tauman testified that he knew "that the entire Hayes family ... was very much involved in criminal activities, that drugs played a huge role in the family dynamics from top to bottom. And my best recollection at this time is that that included his mother." Despite having this information, however, in light of his client's express wishes, Tauman did not pursue it further.[10]

---

**8.** The district court adopted the magistrate judge's findings and recommendations in full, and we review findings of fact for clear error. *See Silva,* 279 F.3d at 835. Our review is "significantly deferential," meaning that "we must accept the district court's factual findings absent a definite and firm conviction that a mistake has been committed." *Id.* (quotation marks omitted). This court has adopted the Seventh Circuit's "earthy" description of the clear error burden facing petitioners: " 'To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must, as one member of this court recently stated during oral argument, strike us as wrong with the force of a five-week-old,

unrefrigerated dead fish.' " *Fisher v. Roe,* 263 F.3d 906, 912 (9th Cir.2001) (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, 233 (7th Cir.1988)).

**9.** Unless otherwise indicated, references in this portion of the opinion to "testimony" come from the evidentiary hearing held by the magistrate judge on Hayes's separate ineffective assistance of counsel claim—namely, whether Tauman properly advised Hayes of a plea agreement. *See infra* Part VI.

**10.** In a letter to Hayes's habeas counsel, Tauman wrote: "I wanted to present evidence of

*Landrigan v. Stewart,* 272 F.3d 1221 (9th Cir.2001), is also similar to this case, in that there the client was "adamant" about not having his family testify. *Id.* at 1225. Tauman likewise testified that Hayes "made it very clear that he didn't want his family involved ... particularly his mother"[11] and that he was "adamantly opposed" to his family being involved. Even Hayes himself repeatedly testified that he made it clear to Tauman that he did not want to involve his family. For example, Hayes testified that he "made it specifically clear to [Tauman] prior to trial that I didn't want to involve my family. And I think he came to me after I had gotten convicted and wanted to involve them in the penalty phase. And I think I reminded him that I didn't want to involve my family." Furthermore, Hayes knew that this evidence could help him avoid the death penalty, but he made the informed decision to forgo such benefit for himself. Hayes's testimony reveals as much:

> Q. You understood why it would have been helpful to your case to have your mother or family members come in and testify to the difficult life either you or they had had in Stockton. You understood—
>
> A. Yes.
>
> . . .
>
> Q. But you were just weighing competing alternatives. You were just looking at the thing and saying, "This might help me out, but it also might cause a problem." And you decided against using them; is that correct?

> A. Yeah. I decided that early on.
>
> Q. And you were pretty set in your ways on that. You'd made up your mind on that, right?
>
> A. That's correct.
>
> Q. Do you think Mr. Tauman could have talked you out of that?
>
> A. No, I don't think so.

*Silva* held that "a lawyer who abandons investigation into mitigating evidence in a capital case at the direction of his client must at least have adequately informed his client of the potential consequences of that decision and must be assured that his client has made informed and knowing judgment." 279 F.3d at 838 (quotation marks omitted); *see also Landrigan,* 272 F.3d at 1225(finding effective assistance where petitioner understood the consequences of his decision not to allow mitigation evidence). Unlike *Silva,* where counsel "never made a serious attempt to educate Silva about the consequences of his decision," 279 F.3d at 841, here Hayes was fully apprised of the importance of presenting mitigating evidence.

Thus, Tauman's decision—at his client's adamant request—not to investigate nor to present evidence of Hayes's family background was reasonable.

## B

With respect to Tauman's failure to investigate and present mental health deficiencies, Hayes does not tell us what specific deficiencies he suffered that Tauman could have shown.[12] "[W]here

---

the defendant's family as a factor in mitigation based upon the fact that his entire family was routed into crime and that this circumstantially demonstrated Blufford never had a chance to do anything but enter into crime.... I specifically did not introduce those factors into mitigation because the *defendant asked I keep his family out of consideration during the penalty phase.*" (emphasis added).

**11.** Tauman testified that Hayes was "sensitive" to and "protective" of his mother being involved in his case.

**12.** In his reply brief, Hayes mentions that he suffered from "educational disabilities," but he does not explain what those might have been or provide any further details.

counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Hendricks v. Calderon,* 70 F.3d 1032, 1043 (9th Cir.1995). Here, however, Hayes's mental health expert at trial, Dr. Cavanaugh, testified at a separate evidentiary hearing that he "didn't see any evidence of major psychiatric illness in [his] notes and records." [13] Tauman had retained Dr. Cavanaugh to advise him on the availability of mental defenses, particularly diminished capacity, and he met with Hayes on multiple occasions.

Tauman testified that he "had used [Dr. Cavanaugh] on a number of cases, trusted him a lot and certainly would have used whatever assistance he could have brought to the table," but Dr. Cavanaugh did not report any indication of mental deficiencies to Tauman nor record any in his notes. Having no indication that Hayes was suffering from a mental illness, Tauman was not required to pursue any further investigation into this area. Rather, he was entitled to rely on an expert whose opinion supported a limitation on further investigation, *see Murtishaw,* 255 F.3d at 947; *Bo-nin v. Calderon,* 59 F.3d 815, 835 (9th Cir.1995), particularly considering the prevailing legal norms at the time Tauman represented Hayes in 1981, *see Jennings v. Woodford,* 290 F.3d 1006, 1015(9th Cir. 2002); *Hendricks,* 70 F.3d at 1039 ("Certainly, in 1981, Hendricks' attorneys did not believe they had any duty to investigate [his] social history in the face of the unanimous opinions of their experts that there was no basis for a mental defense.").

Tauman's performance was not deficient for failing to pursue a futile investigation into Hayes's mental health.

### C

 Hayes also argues that Tauman should have conducted a more extensive investigation into his chemical dependency problems. He faces an uphill battle with this argument since Hayes had conceded on the stand at trial that he was unaffected by drugs or alcohol (or withdrawal therefrom) at the time he committed the crime. Tauman did, however, incorporate Hayes's chemical dependency problems as part of his argument that Hayes would flourish in a structured prison environment—away from the drugs and alcohol that had led to his life of criminality.[14]

---

**13.** The testimony cited in this section comes from the magistrate judge's evidentiary hearing on whether Hayes voluntarily waived his right to be present at the penalty phase of his trial. *See infra* Part VII.

Hayes also argues that the Assistant Attorney General should be disqualified because he retained Dr. Cavanaugh, who had been Hayes's expert at trial, to defend this evidentiary hearing. However, the district court found that the record did not support an inference that the Assistant Attorney General received any confidential information in his limited contact with Dr. Cavanaugh, and this finding is not clearly erroneous.

**14.** Tauman told the jury that "[w]hen [Hayes is] not on drugs, the evidence is pretty clear Blufford is basically an intelligent, basically a personable individual who is a leader, who is a person that benefits those around him. When he succumbs to drugs, he is not that kind of a person.... There is something that comes out when he has alcohol or when he uses drugs that is unlike any of us.... His punishment at the present time for his actions and for not being strong enough to resist drugs and alcohol and not being strong enough to overcome whatever background factors made him that way, is that he will live the rest of his life in prison. His teeth are pulled. The only thing that we are involved with for the death penalty is revenge. That's the single motivating factor at this point. All the evidence shows that once he is in prison, he will not be a destructive force, but presumably a productive force. Maybe help someone."

Furthermore, during the guilt phase, the jury heard from Hayes himself about the extent of his drug problem—including that he had been consuming heroin, Ritalin, and alcohol the night before and morning of the murder—so they were already well aware of Hayes's struggle with drugs and alcohol. *See Bell*, —— U.S. at ——, 122 S.Ct. at 1853 (holding that counsel could reasonably decide not to present mitigating evidence from defendant's medical experts because the "substance of their testimony was still fresh to the jury" from the expert's participation in the guilt phase). The trial judge also instructed the jury that it must consider as mitigating evidence "the effects of intoxication" on Hayes's capacity to commit the crime. *See id.* Finally, Tauman reminded the jury that all of Hayes's past crimes involved drugs or alcohol.

Tauman's efforts were reasonable under the circumstances, and we cannot say that he "made errors so serious that [he] was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* 466 U.S. at 687.

### D

Even if we believed that Tauman's representation was objectively unreasonable, we would still have to find that his errors prejudiced Hayes, *i.e.,* that there is a reasonable probability that but for Tauman's representation, the result of the penalty phase would have been different. *Strickland,* 466 U.S. at 694. Hayes must "affirmatively prove prejudice," *id.* at 693, which requires showing more than just the possibility that Tauman's performance prejudiced the outcome against him. Instead, Hayes must demonstrate that the errors *actually* prejudiced him. *See id.* Whether an error actually prejudiced a defendant is weighed against the "totality of the evidence before the judge or jury." *Id.* at 695. A sentence "only weakly supported by the record is more

likely to have been affected by errors than one with overwhelming record support." *Id.* at 696; *see also Bragg v. Galaza,* 242 F.3d 1082, 1088 (9th Cir.) (holding that "ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case") (quotation marks omitted), *amended by* 253 F.3d 1150 (9th Cir.2001).

This is a tough obstacle for Hayes to clear considering that when asked if trial counsel could have talked Hayes out of his decision not to involve his family, he answered, "No, I don't think so," because he was "pretty set" in his opinion, despite knowing that it would have helped his case. *See Landrigan,* 272 F.3d at 1228(looking to what the defendant says he would have done to assess prejudice). *Landrigan* held that any deficiency in counsel's investigation could not have been prejudicial given the client's "apparently adamant insistence that mitigating evidence not be presented." *Id.* Likewise, here Hayes admitted that nothing could have changed his mind regarding his family's involvement in the penalty phase. Thus, Tauman's alleged failure to investigate had no impact and could not have prejudiced the penalty phase's outcome.

Also, as the magistrate judge found, presentation of family background evidence could have backfired since it showed that much of Hayes's family troubles started *after* he had commenced his criminal conduct and thus, "the jury may have found that [Hayes] chose his path as opposed to having been pushed down it." *Hayes v. Calderon,* No. CIV S–92–0603 DFL GGH P, at 33 n. 20 (E.D.Cal. May 13, 1998) (findings and recommendations). Hayes points to his siblings' mental disorders and suicide attempts and his parents' chronic alcoholism and drug addiction, but the record, while failing to demonstrate some of

these alleged afflictions, also verifies the magistrate judge's observation.

Hayes grew up in poverty, his parents separated shortly after he was born, and he had little contact with his father thereafter. A probation officer's report prepared in connection with Hayes's juvenile murder noted that he lived with his mother and siblings in an older 3–bedroom home, where, although the house left "much to be desired," the "[h]ousekeeping standards appear[ed] excellent." The report continued:

> There appears to be a strong bond of affection and love between [Hayes] and other members of his family; however, it seems that Mrs. Hayes has been unable to effect any real control of Blufford's activities or behavior. Her methods of discipline in the past have been to plead with [Hayes] to change his behavior or his associates.

Mrs. Hayes was described as a "quiet, gentle person" with "a deep abiding love for her son [who] tries to the utmost limits of her ability to provide a proper home for him." Hayes apparently fought with his older sister and did not apply himself in school.

While there were clearly some rough spots in Hayes's life, this is hardly the stuff that renders one less culpable in the eyes of the jury or predetermines one's fate. *Cf. Williams v. Taylor*, 529 U.S. 362, 395–96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (petitioner's parents had been imprisoned for criminal neglect; petitioner had been severely and repeatedly beaten by his father and spent two years in the custody of the state social services bureau; petitioner was also borderline mentally retarded); *Ainsworth v. Woodford*, 268 F.3d 868, 875–76 (9th Cir.2001) (petitioner's father had tried to commit suicide four times, finally succeeding on Christmas Day; petitioner had been severely physically, verbally, and emotionally abused by his father who had twice attempted to kill him; petitioner suffered from acute alcoholic intoxication, psychoneurotic disorder, and depressive reaction and had tried to kill himself six or seven times by slashing his wrists).

Regarding Hayes's own substance abuse problem, as we noted above, the jury and Tauman were already well aware of it.[15] Unlike *Ainsworth*, where we found counsel ineffective for failing to uncover his client's troubled childhood, history of substance abuse, and mental and emotional problems,[16] and noted that "[a] reasonable investigation would have uncovered a substantial amount of readily available mitigating evidence that could have been presented to the jury," 268 F.3d at 874, there was not much more evidence that Tauman could have uncovered that would have been helpful or that the jury did not already know. How was Hayes prejudiced when a more thorough investigation (of facts about which Tauman was already

---

**15.** While we recognize that there is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, *may be less culpable than defendants who have no such excuse*," *Boyde v. Cal.*, 494 U.S. 370, 382, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (quotation marks omitted), Hayes cannot assume that all juries would be sympathetic to his drug and alcohol abuse. *See Mayfield v. Woodford*, 270 F.3d 915, 931 n. 17 (9th Cir.2001) (en banc) ("We note that juries are unlikely to favor defenses based on abuse of dangerous drugs in evaluating a defendant's culpability for violent behavior."); *Boyle v. Johnson*, 93 F.3d 180, 187–88 (5th Cir.1996).

**16.** Unlike Tauman, Ainsworth's counsel also failed to present evidence to the jury regarding his positive adjustment to prison life. *Ainsworth*, 268 F.3d at 874; *see also Williams*, 529 U.S. at 396 (same).

aware) would not have turned up further mitigating evidence?

Finally, the raw brutality and senselessness of his crime—Hayes stabbed a man 22 times for $23 dollars and some cigarettes—and his history of violence makes it more unlikely that additional information regarding Hayes's family or drug and alcohol problem would have made a difference.[17]

As we have noted before: "No doubt counsel could have done more; more is always possible. But we cannot see any reasonable probability that more in this case would have lead to a different sentence." *Pizzuto v. Arave*, 280 F.3d 949, 969 (9th Cir.2002). In short, we hold that the district court did not abuse its discretion in failing to hold an evidentiary hearing on this issue; Hayes has not presented a colorable claim of ineffective assistance of counsel in the penalty phase.

## IV

■ Hayes next contends that the government violated his due process rights by knowingly using false testimony from James. Specifically, James testified that he was not receiving leniency for theft charges pending against him in return for his testimony. In fact, the prosecution had offered such leniency to James through his attorney, although the attorney did not share that information with James.[18]

■ A criminal conviction obtained through the prosecution's knowing use of perjured testimony violates a defendant's right to due process. *Napue v. Ill.*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). A prosecutor has a constitutional duty to correct evidence he knows is false. *E.g., id.; N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1115 (9th Cir.2001) (" 'A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.' " (quoting *Napue*, 360 U.S. at 269–270)). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (footnote omitted); *see also Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir.2002) (analysis must determine whether "there is a reasonable probability that[without all the perjury] the result of the proceeding would have been different") (alteration in original) (quotation marks omitted).

On direct examination, after James had testified that he received transactional immunity from the Patel homicide and participated in the Witness Protection Program, Deputy District Attorney Terrence R. Van Oss asked James: "Other than these

---

**17.** As the magistrate judge wrote, "[Hayes] was not a person whose criminal record in this world would draw much sympathy." *Hayes v. Calderon*, No. CIV S–92–0603 DFL GGH P, at 22 (E.D.Cal. May 13, 1998) (findings and recommendations).

**18.** In its brief, the state continues to deny that there was, in fact, an agreement between the prosecution and James's attorney. Indeed, the California Supreme Court found that there was "no evidence[apart from James's eventual non-prosecution] of any agreement

or understanding, express or implied, that the charges against James would be dismissed." *Hayes*, 52 Cal.3d at 613, 276 Cal.Rptr. 874, 802 P.2d 376. However, the magistrate judge found that an inference could be made from the record that some type of deal existed, and the district court concluded that the record supported such an inference. This finding is not clearly erroneous. We therefore proceed with our analysis under the assumption that a deal between the prosecution and James's attorney indeed existed.

things that you have told us about, have you been made any promises? Have you been offered anything? Has any pressure been put on you? Has anything been done to make you testify here?" James replied, "no." On cross-examination, Tauman asked whether James "had any understanding with the [DA's] office as to what will happen to you on those [separate theft] cases as a result of your testimony here?" James replied, "they gave me immunity to what's happening now, you know, that nothing would be used against me and that my cases would be pending and there wasn't no—no thing about we making no deal for this or that, you know, that I still had my cases pending." Then, on re-direct, Van Oss again asked whether there had been "any deals or any promises or anything else" regarding his pending theft charges. James replied, "No, they still pending, you know. . . . You know, I didn't get no—you know, like they try to make it sound like a deal or something. It wasn't nothing like that, man." Van Oss also represented to the court that no deal had been made.

In fact, the prosecution had, through James's attorney, offered leniency in his pending charges, and, after the jury returned its death verdict, all felony charges against James were dismissed. While Van Oss's tactics were clearly problematic, *see Willhoite v. Vasquez*, 921 F.2d 247, 251–52(9th Cir.1990) (Trott, J., concurring) (calling such tactics a "pernicious scheme without any redeeming features," but, agreeing that the false testimony was not material), it is not clear that James's testimony was, in fact, false.[19]

The district court found that James was unaware of the deal when he testified at Hayes's preliminary hearings and trial; thus, he was not lying when he testified that there was no deal.[20] This finding is fairly supported by the record, particularly a notation in James's attorney's file,[21] Van Oss's testimony that he had not told *James* himself about the deal, and James's sworn statement that he was not informed about a deal by either the prosecution or his own attorney.[22] If James was unaware of the deal, then he was not giving perjured testimony, which distinguishes this case from

19. This is not the first time that we have seen a prosecutor use the questionable tactic of "insulating" witnesses from the knowledge that they will benefit from their testimony by telling just their attorney about a deal for leniency, but then requiring that the attorney not pass it on to the client. *E.g., Phillips v. Woodford*, 267 F.3d 966, 984 (9th Cir.2001); *Willhoite*, 921 F.2d at 248–49.

20. Hayes argues that because the charges had been pending against James for almost two years and because the state promised him that he could return to Florida after testifying, James must have assumed that there was an implicit guarantee that the charges against him would be dropped. While James might have hoped for the best, this does not make the district court's finding that James was unaware of the deal clearly erroneous.

21. On a progress sheet for the charges pending against James, his attorney wrote: "D.A.

rec. O.R. [own recognizance] on this. Van Oss is guy to see. This guy is a witness against Blufford Hayes on the 187 p.c. at the Rice Motel on 1-1-80. THIS IS SECRET INFO!! Don't tell the client, or let the word out, or this guy will be a goner!!"

22. James's statement reads, in pertinent part: "I was granted immunity in the [Hayes] case. I got no immunity for any other case. . . . Neither Van Oss nor any other person from the DA's office ever mentioned anything to me about the charges against myself, or what would happen with them. I do not recall that Pete Kelly [James's attorney] or any other attorney representing me ever told me about any deal with the DA's office or any understanding that I would not go to jail for my own offenses. . . . I had no reason to let any thought about that influence my testimony in a murder case. What was important to me was to tell the truth to prove I was not involved in a murder."

*Phillips v. Woodford*, 267 F.3d 966 (9th Cir.2001), where the witness's attorney testified that he *had* communicated the deal of leniency to his client, who, in turn, testified that none existed. *Id.* at 984. Instead, this case is more like *Willhoite*, where we held that a witness did not falsely testify about the nature of his agreement with the prosecution because, while the witness's attorney knew of a more extensive undisclosed deal, the witness only knew of an agreement for a reduction in the charge against him, to which he did testify. 921 F.2d at 249–50.

While the government's use of James's testimony might not constitute the use of perjured testimony in the strictest sense, it is still troubling. James testified falsely, albeit unknowingly. "This saves him from perjury, but it does not make his testimony truthful." *Id.* at 251 (Trott, J., concurring). Despite our disapproval of the prosecution's conduct, even if James did give perjured testimony, we cannot say that there is a "reasonable probability that [without all the perjury] the result of the proceeding would have been different." *Killian*, 282 F.3d at 1208 (alteration in original) (quotation marks omitted).

 We are also troubled by the prosecutor's direct statements to the trial court that "there has been absolutely no negotiations whatsoever in regard to his testimony. No promises, no discussions about this other offense at all." However, these statements were made outside the presence of the jury and thus did not affect the verdict. In the absence of prejudice, habeas relief based on prosecutorial misconduct is warranted only where "the integrity of the proceeding was so infected that the entire trial was unfair," *Phillips*, 267 F.3d at 986 n. 14 (quoting *Hardnett v. Marshall*, 25 F.3d 875, 879(9th Cir.1994)), and we cannot say that the prosecutor's misconduct rose to that level here.

James testified that he was receiving transactional immunity from prosecution in the Patel murder (without this immunity, James faced possible prosecution as a co-conspirator or accessory), that he received meal money and plane tickets for his testimony, and that he received aid from the Witness Protection Program. Thus, the jury knew that James had motivation to adjust his testimony to assist the government's case and could weigh his testimony accordingly. *See Willhoite*, 921 F.2d at 249.

Furthermore, Tauman impeached James with his drug addiction and criminal record. The jury also knew that James had criminal charges against him in other cases that had been pending for two years. Tauman even suggested that James himself was involved in the Patel murder, which, the district court noted, would be the "most compelling basis for doubting the veracity of [James's] statements: James'[s] effort to exculpate himself and gain immunity in return for handing over Hayes." *Hayes v. Calderon*, No. CIV S–92–0603–DFL GGH, at 10 (E.D.Cal. May 24, 1999) (memorandum of opinion and order). Even if Tauman had used the deal to impeach James, the prosecution could have negated that challenge by showing James's prior consistent statement to the police. *Before* he committed the crimes for which he ultimately received leniency, James had already given a statement to police about the Patel murder that remained *consistent* with his testimony at trial. *See id.* at 9–10.

Moreover, Van Oss did not rely on the absence of such a deal to establish James's credibility to the jury, unlike *Phillips*, where the prosecutor's closing argument emphasized "that the witness had never been promised anything in return for her testimony." 267 F.3d at 983–84. Finally, James's testimony was not crucial to the

prosecution's case because Hayes had made similar incriminating remarks to Gebert, who testified to that effect.[23] *Cf. Killian*, 282 F.3d at 1209 (finding a reasonable probability that perjury affected jury's verdict because witness perjured himself several times and was the "make-or-break witness" for the state).

Thus, even if James's testimony was false, which, in spirit, it probably was, we cannot say that there was a reasonable probability that it affected the jury's verdict. As such, the use of James's testimony did not violate Hayes's due process rights.

## V

■■■■ Related to his *Napue* argument, Hayes argues that the prosecution's failure to disclose its offer of leniency to James's attorney also violated his due process rights because he could have used this information to impeach James's testimony. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires that the prosecution disclose exculpatory evidence on its own motion and without request if suppression of the evidence would deprive the defendant of a fair trial. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "Evidence impeaching the testimony of a government witness falls within the *Brady* rule when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence." *United States v. Brumel–Alvarez*, 991 F.2d 1452, 1458 (9th Cir.1992). The prosecutions's nondisclosure of the benefits James received violated Hayes's right to due process and a fair trial only if the undisclosed evidence was material, *i.e.*, "only if there is a rea-

sonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

The "reasonable probability" standard is violated when the failure to disclose the information " 'undermines confidence in the outcome of the trial.' " *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *Bagley*, 473 U.S. at 678); *see also Strickler v. Greene*, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (failure to disclose must put the "whole case in such a different light as to undermine confidence in the verdict") (quotation marks omitted). Or, as we have formulated the inquiry, "prejudice must result from the failure to disclose the evidence." *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir.2002), *petition for cert. filed*, 70 U.S.L.W. 3758 (U.S. May 28, 2002) (No. 01 1755). The terms "material" and "prejudicial" are interchangeable in *Brady* cases. *Id.* at n. 9 ("Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is 'material.' ").

Our analysis in Part IV of whether James's assertions that he was not receiving leniency in exchange for his testimony affected the jury's verdict overlaps with the question of materiality in the *Brady* context. Thus, because we hold that the use of James's testimony, even if not true, was not material to the jury's verdict, it follows that the failure to disclose the deal with James's attorney was likewise not material and, thus, does not run afoul of *Brady*.

## VI

■■■ After jury selection commenced in his trial, the prosecution offered Hayes a

---

**23.** The dissent argues that James's testimony was critical to establish the death-qualifying special circumstance, *see infra* at 1090; however, Gebert also testified that Hayes told her that he had burglarized Patel's office. When

asked on the stand whether she was "sure that the defendant told you that he had ripped off the motel office," Gebert replied, "Yes.... I'm positive."

plea bargain of first degree murder, with a sentence of 25 years to life. Hayes declined the plea, maintaining that he was guilty only of manslaughter, or, at most, second degree murder. This was, in hindsight, a miscalculation on his part, and he now argues that his trial counsel, Tauman, was ineffective for failing to convince him that he should accept the offer.

■ As outlined above in Part III, to establish ineffective assistance of counsel Hayes must show that Tauman's performance was both objectively unreasonable and prejudicial. *Strickland,* 466 U.S. at 693; *see also Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (applying the two-part *Strickland* test to challenges to guilty pleas based on ineffective assistance of counsel). Again, our scrutiny of an attorney's performance "must be highly deferential," *id.* at 689, and to show prejudice, Hayes must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694. Thus, Hayes must show that had he been properly advised, he would have accepted the plea bargain. *See United States v. Blaylock,* 20 F.3d 1458, 1466–67 (9th Cir.1994); *cf. Hill,* 474 U.S. at 60 (no prejudice established where petitioner failed to allege that had he been correctly advised about his

parole eligibility date, he would have pleaded not guilty and insisted upon going to trial).

The magistrate judge held a two-day evidentiary hearing on this issue and determined that Tauman adequately conveyed the plea to Hayes, but, in any case, Hayes could not establish prejudice because he testified that he would not have accepted the deal under any circumstance. Even now, if the state offered, Hayes would not accept 25 years to life if it meant giving up his other habeas claims.[24]

Tauman testified at the evidentiary hearing that he was "quite sure" and "quite confident" that he told Hayes that the proposed plea bargain was a "good offer." He said that while he did not have a clear recollection of their conversation (it had taken place over 16 years earlier), he "would assume" that he recommended that Hayes accept the offer. The magistrate judge found Tauman's testimony to be credible. Tauman testified that he wished that he had been more assertive with Hayes, had placed more emphasis on the probability of a death sentence in his discussion with Hayes, and had recruited assistance from Hayes's family to convince him to accept the offer. As the magistrate judge observed, however, putting too much pressure on Hayes by pointing out how weak his case was might have backfired and led Hayes to distrust Tauman as he had distrusted his previous attorneys.[25]

---

**24.** In Hayes's habeas petition, he stated that originally he had been offered a sentence of 25 years to *life,* but then, in his declaration that he filed before the evidentiary hearing, he claimed that he had been offered a *straight* 25 year sentence. After a warning from the magistrate judge, Hayes amended his declaration to indicate that he would now accept 25 years to life. At the evidentiary hearing, however, he changed his position and testified that he would not accept the plea if it meant giving up his other habeas claims.

**25.** "Tauman was in no position to hammer upon the weak points in petitioner's case at that time in that the entire defense rested on

petitioner's testimony. In the event that petitioner would refuse the plea offer, Tauman could not, at this late date, destroy petitioner's belief in himself and his case, no matter how misplaced, during the discussion on the plea bargain, and then immediately expect petitioner to recover that belief and confidence which would be necessary for his testimony in the event that the plea offer was rejected. And the more persons Tauman trotted in to tell petitioner how bad his case was, and the fact that he would probably have the death penalty imposed, the worse petitioner's mind set would have been just prior to trial. There was clear risk in being too forceful, and counsel would have to make a tactical deci-

Hayes testified that Tauman never made a recommendation to him (the magistrate judge did not find this testimony to be credible),[26] although he conceded that there was not too much that Tauman could have said to convince him to accept the offer. He testified that he understood at the time that if he entered a plea, there would be no trial.

Hayes now argues that had Tauman spent more time with him[27] and been better prepared for trial, there would have been a greater chance that he would have accepted the plea. For support, Hayes cites *Crandell v. Bunnell,* 144 F.3d 1213 (9th Cir.1998), *overruled on other grounds, Schell v. Witek,* 218 F.3d 1017, 1025 (9th Cir.2000) (en banc), where, because defendant had been "faced with an unconstitutional choice of incompetent counsel or no counsel at all," *id.* at 1214, we affirmed the district court's grant of his habeas writ challenging the trial court's denial of his motion to substitute counsel. However, in *Crandell,* there was such a complete lack of communication between lawyer and client, that the defendant ended up representing himself. *Id.* at 1217–18. Here, there was no such breakdown; Hayes even wrote Tauman after he lost at trial to say that he was a "very fine attorney." This is also demonstrated by the fact that Hayes had rejected previously appointed attorneys, but somehow Tauman managed to win his trust. Indeed, in his letter to the trial court, Hayes fired one attorney because, in Hayes's words, the attorney had already "formed an opinion as to my guilt, and I sincerely feel that if properly and legally pursued there exist circumstances that would exonerate me and establish my innocence on the alleged charges."

*Crandell* is simply inapplicable to the facts before us. While perhaps Tauman could have done more to convince Hayes to accept the prosecution's plea bargain, we cannot say that Tauman failed adequately to advise Hayes regarding the prosecution's proffered plea bargain.

Even assuming that Tauman's performance was inadequate, Hayes has a steep uphill battle to show prejudice. At the evidentiary hearing, the state's counsel asked: "Was it your feeling at the time that there was basically—there wasn't too much [Tauman] could have said that would have gotten you to accept that offer." Hayes responded, "That's correct." He

sion in just how to present the offer." *Hayes v. Calderon,* No. CIV S–92–0603 DFL GGH P, at 18 (E.D.Cal. Nov. 3, 1997) (findings and recommendations).

**26.** More bluntly, the magistrate judge stated that Hayes's "idea of veracity under oath is subject to question." *Hayes v. Calderon,* No. CIV S–92–0603 DFL GGH P, at 15 n. 7 (E.D.Cal. May 13, 1998) (findings and recommendations).

**27.** Hayes relies on Tauman's time sheets, which were admitted at the evidentiary hearing, but on which there was no testimony, to demonstrate how little time Tauman had spent developing a relationship with Hayes. Those timesheets, however, are apparently incomplete and, the state argues, demonstrate only that Tauman was not a precise recordkeeper. The magistrate judge found that the "record [was] silent as to what petitioner's several trial counsel did or did not do" in preparing Hayes for a possible plea bargain. *Hayes v. Calderon,* No. CIV S–92–0603 DFL GGH P, at 20 n. 11 (E.D.Cal. May 13, 1998) (findings and recommendations). *See also Hayes v. Calderon,* No. CIV S–92–0603 DFL GGH P, at 7 (E.D.Cal. July 21, 1998) (order denying reconsideration of findings and recommendations) ("The court will not say that Tauman visited his client as much as he should have. But petitioner had been represented for over a year by several other counsel, who did substantial investigation in the case—even to the point of running down false leads given by petitioner. Tauman did not need to duplicate such investigative efforts, but could reasonably rely on the investigative record when he came into the case."). This finding is not clearly erroneous.

went on to explain that he was not persuadable because of his "deeply held" belief that he was innocent of first degree murder and because of family concerns, *i.e.*, his sister needed him for protection, which he could not provide if imprisoned. Hayes also testified that he had not been willing at that time to give up his right to go to trial.

Because by Hayes's own testimony there was nothing that Tauman could have done to convince him to accept the plea bargain, Hayes has not demonstrated that he would have accepted the deal had he been properly advised. As such, he has failed to establish a claim of ineffective assistance of counsel in the guilt phase.

## VII

▮▮▮▮ On the first day of the penalty phase, when the prosecution was scheduled to call Hayes's past victims as witnesses, Hayes refused to leave his holding cell and come to the court-room. He now argues that because he was experiencing severe Valium withdrawal, he was unable to give a knowing and intelligent waiver of his right to be present. Because an accused's

right to be present during his trial is one of the most basic, before allowing a defendant to waive this right the trial court must satisfy itself that his waiver is voluntary. "The purpose of the 'knowing and voluntary' inquiry ... is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez v. Moran,* 509 U.S. 389, 401 n. 12, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). The magistrate judge conducted a four-day evidentiary hearing on this issue and concluded that Hayes's waiver of his right to be present was, in fact, voluntary.[28]

Due to a disruptive incident during jury selection, the sheriff's medical staff provided Hayes with 20 milligrams[29] of Valium a day throughout the remainder of the guilt phase (October 20, 1981 through November 19, 1981). It was then discontinued, and the penalty phase began on November 24, 1981. That day, Hayes went from the jail to the courthouse, but he refused to put on civilian clothes or to leave his holding cell to come to the courtroom. Hayes's trial counsel, Tauman, had the

---

**28.** Hayes also argues that he was incompetent during the penalty phase, and the trial judge erred by not first assessing whether Hayes was competent to waive his right to be present by holding, *sua sponte*, a competency hearing. If Hayes was competent, the question then becomes whether his waiver was knowing and intelligent. "[A] competency determination is necessary only when a court has reason to doubt the defendant's competence." *Godinez,* 509 U.S. at 402 n. 13. Hayes argues that because the trial court knew his medication had been withdrawn, a reasonable judge would have had a bona fide doubt of his competence. A "bona fide doubt exists if there is *substantial evidence of incompetence.*" *Amaya–Ruiz v. Stewart,* 121 F.3d 486, 489 (9th Cir.1997) (emphasis added) (quotation marks omitted). Hayes bears the burden of demonstrating incompetence by a preponderance of the evidence. *Simmons v. Blodgett,* 110 F.3d 39, 41 (9th Cir.1997). For

the reasons that follow in this part of the opinion, the trial court did not err by not holding a *sua sponte* competency hearing because the evidence before it of incompetency was not at all substantial, nor did it indicate that Hayes lacked "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or to understand, both rationally and factually, the proceedings against him. *Godinez,* 509 U.S. at 396 (quotation marks omitted).

**29.** Hayes argues that, at least on some days, he received 30 milligrams of Valium. However, for the reasons set forth by the magistrate judge and adopted by the district court, it is far more likely that he consistently received 20 milligrams. *See Hayes v. Calderon,* No. CIV S–92–0603 DFL GGH P, at 16 (E.D.Cal. Nov. 3, 1997) (findings and recommendations). This finding is supported by the record and not clearly erroneous.

following exchange with the trial judge, Judge Saiers:

[Tauman]: [Hayes] seems to be rational this morning and he has indicated to me that based on what's gone on so far and what he anticipates will happen in terms of the nature of the evidence and the nature of the arguments, that he does not wish to be present.

He has indicated to me that he does not want to come into the courtroom at all and I have discussed it with him and, to a certain extent, I must say I am in agreement with him.

*It would certainly not do him any good to come out here and be disruptive.* He knows that and I know that and we have discussed it and I think that it's in his interest not to be here if that's the way he is going to react to the evidence, which I believe he will.

[The Court]: So he indicated that he wasn't sure if he could control himself when the evidence is being introduced at this time of the proceedings?

[Tauman]: That's correct, Your Honor. He indicates further he doesn't want to come out of his holding cell. He doesn't know what he would be inclined to do and, I think again, I agree with him. I think it's a choice that he makes because he doesn't want to either prejudice his case or hurt anybody, which might well happen if he did come out.

Now, in terms of being disruptive, I think that I am in a position to say that he would be disruptive and that he has been disruptive in the holding cell in terms of cooperating with the bailiffs. . . .

. . .

I *object vehemently to the Court ordering that he be brought out because he will be brought out kicking and screaming,* I'm afraid, and this Court will ultimately have to pass on or may have to pass on the question of life or death, and I don't think that seeing him out here in that condition is going to make it any easier for the Court. . . . I can't say it more firmly than I am saying it. *I am opposed unalterably to him being brought out here,* being dragged out here or carried out here by the bailiffs. . . . [I]t is over my *strenuous opposition* that we do anything in terms of danger to the defendant or danger to the bailiffs and danger to other people that might be involved.

(emphasis added).

Judge Saiers went to the holding cell and talked with Hayes off the record (counsel for both sides were present); when he returned to the courtroom he reported his conversation:

I just talked to Mr. Hayes for about five minutes, he indicates he doesn't want to come into the court-room. He doesn't want to hear the evidence that[the prosecution] is going to be producing. He feels that the jury has already made up their mind, that he is not going to be in the position to sit and beg the jury for his life, that he would be disruptive. He prefers to stay in the holding cell. The only way he would leave the holding cell apparently would be by the bailiffs forcibly dragging him into the courtroom and he would be disruptive during the proceedings. . . .

The attorneys were present as were the bailiffs and heard that Mr. Hayes absolutely does not wish to appear, and it would take force to bring him in and that he just could not sit through it and would be disruptive.

As soon as the jury filed in, Judge Saiers instructed them, "As you will notice, the defendant is not present. He has elected after discussions not to be present during this stage of the hearing. You are not to consider that fact at all in the determination of the facts in this case or in arriving

at a verdict. That is in to [sic] no way influence your decision in this case because Mr. Hayes is not present." The judge also repeated a similar instruction later in the proceedings.

At the evidentiary hearing, Judge Saiers testified that Hayes was controlled, calm, and responsive during their conversation, but he was simply "adamant" and "emphatic" that he did not want to hear his victims testify against him. The Judge advised Hayes that it would be in his best interest to be present because it would make it more difficult for the jury to return a death sentence. He also asked whether Hayes would prefer to wait to start the penalty phase the next day, but Hayes said he did not think that would make a difference. The sheriff's medical staff, per the Judge's request, put Hayes back on Valium, and Hayes returned the next day to hear closing arguments in the penalty phase.

Dr. Cavanaugh, a psychiatrist who had evaluated Hayes before the trial, testified at the evidentiary hearing that: (1) patients with a history of sedative drug use can develop dependence on Valium within a few weeks; (2) mild withdrawal reactions can include impaired concentration, fear, and apprehension; (3) anxiety disorder can prevent someone from making a rational decision or thinking clearly; and (4) sudden discontinuance from Valium can cause anxiety symptoms to reoccur at a level exceeding the original level of anxiety. He did not offer an opinion, however, as to whether or not Hayes had suffered effects from the discontinuation of medication on the day he refused to appear in court.

Dr. Wilkinson, Hayes's psychiatric expert, testified that street drug addicts are predisposed to Valium dependence and can have more severe withdrawal reactions. He testified, with a 75–80% degree of medical certainty, that withdrawal rendered Hayes "emotionally too disorganized to do that high level of function" necessary to decide whether to attend a critical stage of trial. Dr. Wilkinson conceded, however, that a withdrawal reaction is a "waxing and waning phenomenon" wherein a person having such reaction could have lucid periods.

The magistrate judge's findings and recommendations, adopted in full by the district court, concluded that while it was possible that the discontinuation of Valium affected Hayes's mental capacities, there were strong reasons as to why it was not reasonably probable: (1) the potential for severe withdrawal reaction was less likely given the dosage and duration of the medication that Hayes received; (2) Dr. Wilkinson's opinion that Hayes was incompetent was equivocal and inherently weak; (3) Hayes's belated report of symptoms of withdrawal is inconsistent with what Judge Saiers and Tauman had observed in November 1981;[30] (4) Hayes did not demonstrate many other symptoms attributed to withdrawal—irritability, tremors, noticeable or debilitating anxiety, panic attacks, or inability to concentrate; (5) Hayes's decision not to attend was consistent with his history of impulsive and recalcitrant

---

**30.** Tauman's and Judge Saiers's *contemporaneous* observations of Hayes's demeanor are entitled to particular weight. *Cf. Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir.1991) ("While the opinion of Hernandez's counsel certainly is not determinative, a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings. We deem significant the fact that the trial judge, government counsel, and Hernandez's own attorney did not perceive a reasonable cause to believe Hernandez was incompetent.") (citation omitted). However, we do not, without question, blindly accept counsel's representations concerning his client's mental state. *See United States v. Timmins*, 301 F.3d 974, 981–82 (9th Cir.2002).

behavior, which he had demonstrated prior to and during his trial;[31] and (6) Hayes's expressed reason at the time for not wanting to attend—he did not want to hear his previous victims testify against him—was reasonable, albeit a potential miscalculation. These findings are amply supported by the record.

Hayes did not want to hear his past victims speak against him, and he made it quite clear to his counsel and the trial judge that, despite knowing that being present was in his best interest, he did not want to attend and would be disruptive—to the point of being dangerous—if forced. This was Hayes's decision to make. Even with a strong presumption against waiver, Hayes's evidence, which, in essence, consisted of a doctor's opinion, discredited by the district court and offered over 16 years after the fact, that Hayes probably suffered withdrawal symptoms, falls far short of establishing that Valium withdrawal so clouded Hayes's judgment as to make his decision not to attend the first day of the penalty phase involuntary.

## VIII

■ The prosecution used four of its 24 peremptory challenges against African Americans—three prospective jurors (Harris, Johnson, Hamilton) and one prospective alternate juror (Myles). On appeal, Hayes does not contest the challenge used on Johnson. Although Hayes's trial occurred before *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was decided, California law already required *Batson*-like procedures for reviewing a race-based challenge to a prosecutor's use of his peremptories. *People v.*

*Wheeler*, 22 Cal.3d 258, 280–82, 148 Cal. Rptr. 890, 583 P.2d 748 (Cal.1978). Hayes contested on racial grounds the dismissal of the four jurors named above, but the trial court, satisfied with the prosecution's race-neutral explanation, denied Hayes's *Wheeler* challenge. Ultimately, three African American jurors sat on the jury—a 25% showing compared to San Joaquin County's overall African American percentage of population of 5.5% (at the time of jury selection).

*Batson* sets forth a three-part test. First, Hayes must establish a prima facie showing that the prosecution used its peremptory challenge based on race. *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). If so, the prosecution then must articulate a race-neutral explanation for the challenge. "The second step of this process does not demand an explanation that is persuasive or even plausible." *Id.* at 767–68. In fact, at this step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Finally, the trial court must determine if the defendant has proven purposeful discrimination. *Purkett*, 514 U.S. at 767.

■ At *Batson* step three, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.... [T]he best evidence often will be the demeanor of the attorney who exercises the challenge," the evaluation of which lies "pecu-

---

**31.** Those misguided decisions included his instruction to his attorney that he did not want any family members involved at the penalty phase, his refusal to waive time for his trial even though his attorney advised him that such a waiver was necessary for his preparation for preliminary examination, his refusal

to meet with a qualified court-appointed attorney because he believed he was entitled to an out-of-town appointed counsel of his choice, his dismissal of or refusal to meet with other appointed attorneys, and his refusal of a plea bargain.

liarly within a trial judge's province." *Hernandez,* 500 U.S. at 365(quotation marks omitted); *see also McClain v. Prunty,* 217 F.3d 1209, 1220–21 (9th Cir. 2000); *Wheeler,* 22 Cal.3d at 282, 148 Cal. Rptr. 890, 583 P.2d 748 ("[W]e rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination."). "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson,* 476 U.S. at 98 n. 21. In fact, we review the trial court's finding that the prosecutor did not use its peremptories in a discriminatory way for clear error. *McClain,* 217 F.3d at 1220.

■ For each *Wheeler* challenge Hayes made, the trial court called upon the prosecution to explain itself, thereby implicitly ruling that Hayes had established a prima facie case. *See Hernandez,* 500 U.S. at 359; *United States v. Bishop,* 959 F.2d 820, 824 (9th Cir.1992). The prosecution offered race-neutral explanations, thus, the dispute centers on *Batson* step three, *i.e.,* whether those reasons should be believed. Hayes asserts that the trial court did not properly assess the sincerity of the prosecutor's race-neutral explanation and instead relied solely on the fact that there were other African Americans on the jury to deny his *Wheeler* challenges. A determination that African Americans in general were not totally excluded from the jury is alone not enough to resolve the question of whether the particular jurors in question were excluded because of their race. *Bishop,* 959 F.2d at 827(discussing the "critical distinction between using proportional representation as evidence of the government's sincerity and using it to offset a constitutional violation").

Taking each juror in turn, we proceed:

*Juror Harris:* The prosecutor's race neutral reasons for challenging Harris were (1) she had a warrant out for her arrest on a traffic matter, and he felt that she might have negative feelings about law enforcement due to her own legal problems; and (2) she was in the middle of a divorce from her husband who was a state correctional officer, so he thought that acrimonious feelings from the divorce proceedings might also negatively influence Harris's beliefs about law enforcement.

After some discussion with the prosecutor about how he had obtained this background information on Harris, the trial judge denied Hayes's *Wheeler* motion "based upon the reasons stated in open court concerning the warrant and the— primarily the warrant, but also the fact that she is going through the divorce. I think she is upset that it's taking so long." The trial court's finding on this credibility issue is one that we should presume correct, unless not fairly supported by the record. 28 U.S.C. § 2254(d)(8); *Purkett,* 514 U.S. at 769. Hayes argues that the trial judge erred by not examining whether the prosecutor's reasons were credible; however, that the judge repeated the prosecutor's race-neutral reasons as the basis of denying Hayes's *Wheeler* motion indicates that he found them valid.

*Jurors Hamilton and Myles:* The prosecutor had three race neutral reasons for challenging Hamilton: (1) he had been refused full-time employment with the Tracy Police Department, so he might have some resentment about being turned down for police employment; (2) he claimed that he was accepted for employment with the Stockton Police Department, but that would have been impossible because of the Stockton Police Department's age requirement; and (3) Hamilton was prone to exaggeration, including a comment that he had a "photostatic" mind. Hayes did not

challenge the factual accuracy of this assertion at trial, although he now expresses doubts.[32]

The prosecutor challenged Myles because a person's wallet had been found at a crime scene pertinent to this case, and Myles's daughter employed the wallet's owner (named Vargas) at her beauty salon. Again, Hayes did not challenge the factual accuracy of this assertion at trial, but now expresses doubts.

The trial judge denied Hayes's *Wheeler* challenges regarding Hamilton and Myles:

> As to Hamilton and Myles, the Court is going to overrule the objection based on automatic exclusion of a particular group. I didn't remember the photostatic mind, of Mr. Hamilton, but I imagine that's in the record. [It was.]

> And Mrs. Myles, apparently—I didn't realize the name of this Vargas—well, I didn't know anything about Vargas being employed by her daughter.

> The Court is going to overrule the objection on that—noting that we do have two blacks on the panel; and a black as an alternate [who was later placed on the panel], so there was no systemic exclusion, based on the composition of the jury that we presently have.

Again, Hayes argues, more convincingly this time, the trial judge did not properly assess the credibility of the prosecutor's reasons, particularly considering that the prosecution could have believed that the jury was becoming "too black" given Hayes's race (African American). As the magistrate judge noted, however, because *Batson* had not yet been decided, "the trial judge ... did not have the benefit of the *Batson* decision, nor eleven years of adjudication history which defined the required

process for *Batson* challenges. Therefore, one should not be unreasonably critical of the 'failure' of the trial judge to clearly enunciate the three separate findings for a *Batson* challenge." *Hayes v. Calderon,* No. CIV S-92-0603 DFL GGH P, at 22 (E.D.Cal. Dec. 16, 1997) (findings and recommendations).

■ The "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from the opponent of the strike." *Purkett,* 514 U.S. at 768. At trial, Hayes did not challenge the prosecutor's race-neutral reasons, thus, it is hard to see how he met his "ultimate burden." In *United States v. Bauer,* 84 F.3d 1549 (9th Cir.1996), defense counsel offered no evidence to rebut the prosecution's race-neutral explanations, so the trial court understandably found that defendant had not proven racial discrimination. *Id.* at 1554. We affirmed as to that issue, holding that "[t]he correctness of the court's ruling must be considered in terms of the information that was before [it] at the time that the *Batson* objection was raised. The only question is whether the rejection of the defendants' *Batson* objection was clearly erroneous *in light of the information the district court had before it." Id.* at 1554–55. As in *Bauer,* Hayes did not rebut the prosecution's stated race-neutral reasons and, therefore, failed to satisfy his burden of persuasion.

■ While a trial court cannot rely exclusively on the racial makeup of the jury to determine that there has been no discrimination, it is still a permissible, relevant factor in assessing the genuineness of the prosecutor's race-neutral reasons. *See Turner v. Marshall,* 121 F.3d 1248, 1254 (9th Cir.1997) ("[T]he fact that the prose-

---

**32.** Hayes argues that the prosecutor's reasons were factually inaccurate because Hamilton had in fact applied for the *Sheriff's* Department, not the *Police* Department, in Tracy. However, this minor discrepancy does not raise any "serious questions about the legitimacy of [the] prosecutor's reasons for exercising peremptory challenges." *McClain,* 217 F.3d at 1221.

cutor accepted four African–Americans on the jury may be considered indicative of a non-discriminatory motive...."); *Bishop,* 959 F.2d at 827 ("[R]epresentativity and, more generally, a prosecutor's acceptance of black jurors, are factors that a trial judge may take as an indication of non-discriminatory motive.").

Because the record fairly supports the trial court's ruling, we cannot say the prosecution's use of its peremptory challenges constituted a *Batson* violation.

### IX

 Hayes argues that the evidence was insufficient to support the jury's finding that Patel's murder was committed during the perpetration of a burglary.[33] More specifically, Hayes argues that the evidence shows that he formed the intent to burglarize Patel only *after* he inflicted the fatal blows. In considering the sufficiency of the evidence, we ask whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Va.,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This court has emphasized that "[t]he relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." *United States v. Mares,* 940 F.2d 455, 458 (9th Cir.1991).

 To support the burglary-murder special circumstance,[34] "[t]he evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death; evidence which establishes that the defendant formed the intent only after engaging in the fatal acts cannot support a verdict of first degree murder." *People v. Anderson,* 70 Cal.2d 15, 34, 73 Cal.Rptr. 550, 447 P.2d 942(Cal.1968); *see also People v. Reynolds,* 186 Cal.App.3d 988, 998, 233 Cal.Rptr. 596 (Cal.Ct.App.1986) ("[A] murder which precedes the formation of the intent to rob or steal is not within the perpetration of robbery or burglary."). Of course, it is the factfinder's province to determine witness credibility, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. Thus, if the record of historical facts supports conflicting inferences, we assume "that the trier of fact resolved any such conflicts in favor of the prosecution," and we "must defer to that resolution." *Jackson v. Va.,* 443 U.S. at 326. "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *United States v. Jackson,* 72 F.3d 1370, 1381 (9th Cir.1995).

Hayes argues that the evidence established that he had been sleeping immediately prior to the fatal fight and, therefore, could not have formed the intent to burglarize before he inflicted the fatal wounds.[35] He relies on James's testimony

---

**33.** The jury found as a special circumstance that "the murder was committed when the defendant was engaged in the commission of ... [a] burglary."

**34.** Hayes also argues that the evidence was insufficient to support his conviction of felony-murder, where the killing must have "resulted from" the burglary. We think that our analysis of whether the evidence was sufficient to support the burglary-murder special circumstance also disposes of this almost

identical claim. As the California Supreme Court held, "because the jury convicted defendant of burglary and found true the burglary-murder special circumstance, we are able to determine from the record that the jurors agreed that defendant was guilty of felony murder in the perpetration of a burglary." *People v. Hayes,* 52 Cal.3d at 629, 276 Cal.Rptr. 874, 802 P.2d 376.

**35.** Hayes also argues that the government conceded that there was insufficient evidence

that when he saw Hayes after the murder, he appeared "like he just woke up and his eyes was [sic] kind of stretched," and Hayes's statement to James that he had been awakened by Patel. Only through speculation and conjecture can the prosecution establish that he had the requisite intent, Hayes argues.

However, there is ample evidence to support the jury's finding that Hayes formed the intent to burglarize Patel either before or during the murder: (1) Hayes had a drug and alcohol problem that necessitated a large quantity of money, which made it more likely that the attack on Patel was not just a random act of violence; (2) Wyatt overheard Hayes complain to Patel about a leak in Room 15, and Patel stated that he would come to the room later; (3) there was blood splattered all over the bathroom (where Hayes told Patel the leak was), but only on a few scattered spots in the living area of the room—indicating that there had been no struggle in the living area as Hayes testified; (4) similarly, there were no other

signs of struggle in the living area; (5) Patel was found with his feet and hands tied with coat hangers;[36] (6) Patel was much smaller than Hayes and had called the police when he had problems previously with Hayes (e.g., trespassing, *supra* n. 1) rather than risk physical confrontation; and (7) the Cross incident established that Hayes can form the intent to burglarize before or during a struggle with his victim. Furthermore, Hayes testified that he had been awake the entire three days before the murder, so it is not unreasonable that his eyes possibly looked less than refreshed when James saw him. James's girlfriend Gebert testified, however, that when she saw Hayes that morning he "wasn't drowsy or nothing," which further undercuts Hayes's version of events.

Under these circumstances, a jury could reasonably have believed either that Hayes lured Patel into the bathroom in order to incapacitate him and to burglarize his apartment, or that Hayes opportunistically decided to disable Patel and burglarize his apartment when Patel came into the bathroom to fix the leak.[37] The evidence was

by failing to oppose this issue in response to Hayes's summary judgment motion. However, this argument is flatly contradicted by the record.

36. Hayes admitted that Patel was still alive when he bound his hands and legs, suggesting that Hayes sought to ensure that Patel could not disrupt his burglary plans. As the magistrate judge noted, "[t]he prosecution's argument that there was no point in binding a person who is already dead has a common sense attraction to it." *Hayes v. Calderon*, No. CIV S–92–0603 DFL GGH P, at 75 (E.D.Cal. Dec. 16, 1997) (findings and recommendations).

37. Hayes also raises an ineffective assistance of counsel claim against his appellate counsel on his direct appeal for failing to appeal the trial court's denial of his motion for judgment of acquittal based on insufficient evidence. In considering this motion, the trial court only looks at the prosecution's case-in-chief. *See* Cal.Penal Code § 1118.1. The *Strickland* standard applies to appellate counsel. *See*

*Pollard v. White*, 119 F.3d 1430, 1435 (9th Cir.1997). Hayes can establish neither deficient performance nor prejudice, however. Appellate counsel is not constitutionally required to "raise every 'colorable' claim suggested by a client." *Jones v. Barnes*, 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *see also Pollard*, 119 F.3d at 1435 ("A hall mark of effective appellate counsel is the ability to weed out claims that have no likelihood of success, instead of throwing in a kitchen sink full of arguments with the hope that some argument will persuade the court."). Thus, whether appellate counsel acted unreasonably in failing to raise a particular issue is often intertwined with the merits of the issue and whether the defendant would have prevailed. *See Miller v. Keeney*, 882 F.2d 1428, 1434–35 (9th Cir.1989). To demonstrate prejudice, Hayes must establish that it was reasonably probable that, but for counsel's error, he would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285–86, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). As outlined above, there was ample evidence

sufficient to support the jury's verdict on the burglary-murder special circumstance.

## X

A defendant has a due process right to jury instructions as to all elements of the crime for which he is accused.[38] *Mullaney v. Wilbur*, 421 U.S. 684, 703–04, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Furthermore, "[t]he Eighth Amendment requires that a jury's discretion be sufficiently channeled to allow for a principled distinction between the subset of murders for which the sentence of death may be imposed and the majority of murders which are not subject to the death penalty." *Wade v. Calderon*, 29 F.3d 1312, 1319 (9th Cir.1994). Thus, the jury must be instructed properly on all the elements of a special circumstance, as well. Under California law, to be guilty of felony murder and the burglary-murder special circumstance, the intent to commit that felony must have been formed before or during—not after—the fatal assault. *Anderson*, 70 Cal.2d at 34, 73 Cal.Rptr. 550, 447 P.2d 942.

Hayes argues that the jury erroneously did not receive a specific instruction that if his intent to commit burglary arose after the fatal blow, he was not guilty of felony murder or the burglary-murder special circumstance. The trial court should have given this instruction sua sponte, he argues. The instruction to the jury on felony murder read:

> The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs *as a result of* the commission of the crime . . . of burglary . . . and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree.

(emphasis added). The California Supreme Court, on direct appeal, rejected Hayes's claim because the "felony-murder instruction, in conjunction with the instruction defining burglary, adequately informed the jury that defendant was guilty of burglary-murder only if the intent to steal was formed before the fatal blow was struck." [39] *Hayes*, 52 Cal.3d at 629–30, 276 Cal.Rptr. 874, 802 P.2d 376.

The trial judge also instructed the jury that to find the burglary-murder special circumstance, "the murder[must have been] committed while the defendant was *engaged in the commission of* a burglary," and "was committed *in order to carry out or advance the commission of the crime* of . . . burglary. In other words, the special circumstance referred to in these instructions is not established if the . . . burglary [was] merely incidental to the commission of the murder." (emphasis added).

The instructions as given by the trial court make the temporal requirement per-

---

presented in the prosecution's case-in-chief (which did not include Cross's testimony) to support the burglary special circumstance. Therefore, it does not seem reasonably probable that Hayes would have prevailed on this claim in his direct appeal, and we reject his ineffective assistance of counsel argument.

**38.** Generally, claims of error in state jury instructions are a matter of state law and do not invoke a constitutional question unless they amount to a deprivation of due process. *See Cooks v. Spalding*, 660 F.2d 738, 739 (9th Cir.1981) (per curiam).

**39.** The trial court's instruction defining burglary read, in relevant part: "at the time of the entry [into the manager's office], such person had the specific intent to steal and take away someone else's property, and intended to deprive the owner permanently of such property." This court, however, does not accept the practice of attempting to cure a constitutionally defective special circumstance instruction with the spillover effect from a different instruction regarding guilt. *Wade*, 29 F.3d at 1320.

fectly clear; if the intent to commit burglary is not formed until *after* the killing is completed, the killing cannot possibly have occurred "as a result of" the burglary. Indeed, as the magistrate judge correctly noted, "No one at trial had a misconception concerning the necessity for the prior-to-killing formed intent to burglarize." *Hayes v. Calderon,* No. CIV S–92–0603 DFL GGH P, at 64(E.D.Cal. Dec. 16, 1997) (findings and recommendations).

Even if the instructions had been ambiguous, the prosecutor, in his closing argument, told the jury that in order to convict, it had to find that the murder was committed during the course of the commission of a felony, and that Hayes inflicted the fatal wounds in order to further the burglary. Similarly, defense counsel told the jury that Hayes's intent to burgle must have "occurred prior to the homicide."

While counsels' closing arguments could not overcome a patently deficient instruction,[40] the arguments may eradicate ambiguity in an instruction. *See Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *McLaughlin v. State Farm Mut. Auto. Ins. Co.,* 30 F.3d 861, 868 (7th Cir.1994); *cf. Wade,* 29 F.3d at 1321 (where prosecutor's argument could have, but did not, cure ambiguousness in instruction; and noting that "[i]n general, a prosecutor's argument carries less weight than a jury instruction"). Furthermore, to warrant reversal the error in

the jury instructions must be one involving "fundamental fairness" (which is a narrow category) and " 'by itself so infect[ ] the entire trial that the resulting conviction violates due process.' " *Estelle,* 502 U.S. at 72–73(quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). Here, Hayes's burden is "especially heavy" because "[a]n omission or an incomplete instruction," which is what Hayes alleges, "is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe,* 431 U.S. 145, 155, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977).

Hayes fails to meet this burden. Assuming that there was some ambiguity in the jury instructions that counsels' closing remarks failed to remedy, the error did not "infect" the entire proceeding, as required for habeas relief. The trial court's jury instructions did not violate Hayes's due process rights.

## XI

 Finally, Hayes argues that his conviction was an "unforeseeable judicial enlargement of a criminal statute, applied retroactively, [which] operates precisely like an ex post facto law," and therefore violates due process. *Bouie v. City of Columbia,* 378 U.S. 347, 353, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). Prior to his conviction, he argues, there was no case in which a California appellate court upheld a burglary-murder conviction when the murder occurred *before* the burglary; rather, the "continuous transaction"[41] test had only

---

**40.** *See Murtishaw v. Woodford,* 255 F.3d 926, 969 (9th Cir.2001) ("[C]ounsel's arguments alone cannot salvage a legally erroneous instruction.").

**41.** California courts ask whether the burglary and the murder were part of one continuous transaction. "There is no requirement of a strict 'causal' or 'temporal' relationship between the 'felony' and the 'murder.' All that is demanded is that the two are parts of one continuous transaction." *People v. Berryman,* 6 Cal.4th 1048, 1085, 25 Cal.Rptr.2d 867, 864 P.2d 40 (Cal.1993) (citations omitted) (quota-

tion marks omitted), *overruled on other grounds, People v. Hill,* 17 Cal.4th 800, 823 n. 1, 72 Cal.Rptr.2d 656, 952 P.2d 673 (Cal. 1998).

Hayes argues that the California Supreme Court improperly interpreted Cal.Penal Code § 190.2(a)(17)(G) in applying the "one continuous transaction" rule to this case. However, "the California Supreme Court is the final expositor of California law," *Bonin,* 59 F.3d at 841, and "[w]e are bound by a state court's construction of its own penal statutes."

been applied to murders occurring *after* the burglary.

▇▇▇ "The principle underlying *Bouie* ... is that due process forbids the imposition of criminal penalties against a defendant who had *no fair warning* that his conduct violated the law." *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir.1987) (emphasis added). To violate due process, the construction given the statute by the state court must have been a "radical and unforeseen departure from prior law." *United States v. Walsh*, 770 F.2d 1490, 1492 (9th Cir.1985); *see also Rogers v. Tenn.*, 532 U.S. 451, 461, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001) (A state supreme court's construction violates due process only where it is " 'unexpected and indefensible by reference to law which had been expressed prior to conduct in issue.' " (quoting *Bouie*, 378 U.S. at 354)).

▇▇▇ Here, the California Supreme Court applied established state law in determining that Hayes was guilty of burglary-murder if he *intended* to commit burglary when he killed Patel and if the killing and subsequent burglary of Patel's office/residence were part of one "continuous transaction." *Hayes*, 52 Cal.3d at 631–32, 276 Cal.Rptr. 874, 802 P.2d 376; *see also People v. Welch*, 8 Cal.3d 106, 118, 104 Cal.Rptr. 217, 501 P.2d 225 (Cal. 1972) ("[T]he homicide is committed in the perpetration of the felony if the killing and the felony are part of one continuous transaction.") (quotation marks omitted). Because its decision was supported by analogous precedent, the California Supreme Court's decision can hardly constitute a "radical and unforeseen departure from former law." *Walsh*, 770 F.2d at 1492. Even taking as true that the application of the "continuous transaction" doctrine to these particular facts was novel, "*Bouie* applies only to unpredictable shifts

in the law, not to the resolution of uncertainty that marks any evolving legal system." *United States v. Killion*, 30 F.3d 844, 846 (7th Cir.1994) (quotation marks omitted).

There was no such "unpredictable shift" in the state court's application of the "continuous transaction" doctrine to Hayes's crime. Therefore, there was no ex post facto problem with Hayes's burglary-murder conviction.

## XII

▇▇▇ As this court has observed before, a defendant is "entitled to a fair trial, not a perfect one." *Mancuso v. Olivarez*, 292 F.3d 939, 958 (9th Cir.2002). Because Hayes received a fair trial and for the reasons outlined above, he has failed to establish a valid claim for habeas relief.

**AFFIRMED.**

THOMAS, Circuit Judge, concurring in part and dissenting in part:

The prosecution's knowing presentation of false testimony, its failure to disclose exculpatory material to the defendant, and penalty phase ineffective assistance of defense counsel require reversal. Thus, I must respectfully dissent from Sections III, IV and V of the majority opinion and the judgment. In all other respects, I concur.

## I

One of the bedrock principles of our democracy, "implicit in any concept of ordered liberty," is that the government may not use false evidence to obtain a criminal conviction. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Deliberate deception of a judge and jury is "inconsistent with the rudimen-

*Aponte, v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993).

tary demands of justice." *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). Thus, "a conviction obtained though use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue,* 360 U.S. at 269.[1] "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991) (quoting *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975)).

In this case, the government knowingly presented false evidence to the jury and made false representations to the trial judge as to whether the government had agreed not to prosecute a key witness, Andrew "A.J." James. Prior to trial, the prosecutor had reached an agreement with James' attorney as to future prosecution of charges against James and, in fact, after the jury had returned a death verdict, all felony charges against James were dismissed.

At trial, the government deliberately painted a completely different picture. First, the government misled the trial judge. In preliminary proceedings, defense counsel inquired "whether any negotiated settlement has been made in return for his [James'] testimony." To that, the prosecutor responded:

> There has been absolutely no negotiations whatsoever in regard to his testimony. No promises, no discussions about this other offense at all.

Upon further inquiry by the trial judge about "whether there has been any negotiations," the prosecutor replied:

> That was asked of Mr. James at the time of the preliminary examination and

he testified that there had been absolutely no promises and no discussions in regard to any pending charges and that is the status of the case. There has been no discussions in regard to any pending charges.

When James testified, the prosecutor elicited the following testimony:

> Q. All right. Other than these things that you have told us about, have you been made any promises? Have you been offered anything? Has any pressure been put on you? Has anything been done to make you testify here?
>
> A. No.

After defense counsel probed in cross-examination the lack of activity in prosecuting James, the prosecutor elicited the following testimony on redirect from James:

> Q. You and I have discussed the fact that you have other charges pending; isn't that correct?
>
> A. Right.
>
> Q. Okay. And you would tell the jury what if anything of any deals or any promises or anything else has been made in regards to this charge?
>
> A. No. There are still pending, you know.... You know, I didn't get no— you know, like they try to make it sound like a deal or something. It wasn't like that, man. I just don't want no involvement, you know.

In closing, the prosecutor emphasized the truthfulness of the government's witnesses, stating:

> The implication is that somehow all the prosecution's witnesses are lying and the only person that is telling the truth in this case is the defendant. I ask you, is that reasonable? Is that the sort of

---

1. This rule applies even when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. *Alcorta v.* *Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942).

reason the Court is asking you to use when it tells you that you must use the standard of reasonable doubt in this case? That somehow everybody is lying, but the defendant?

That's not the reason and that's not the standard of proof in this case. Andrew James may be a very bad man, he may have a bad past, he is not a murderer as the defendant is in this case.

Under *Napue,* constitutional error occurs when (1) the presented evidence was false; (2) prosecution knew or should have known the evidence was false; and (3) the evidence was material. *See Napue,* 360 U.S. at 269–71.

There is little doubt that the evidence presented to the jury was false, and that the prosecution knew or should have known the evidence was false. James' attorney testified that there was a deal, and the district court found that:

It is undisputed that James was never prosecuted. Also, the court finds that the prosecutor [ ] tacitly admitted in an evidentiary hearing in another case that he had made some type of agreement with James' lawyer for the 1980 arrests at or about the time that James appears at his arraignment.

Thus, the sole question is whether the presentation of the false evidence was material. "Because the use of known lies to get a conviction deprives a defendant of his constitutional right to due process of law," we are required to reverse a conviction obtained through those means unless the error was " 'harmless beyond a reasonable doubt.' " *United States v. LaPage,* 231 F.3d 488, 491 (9th Cir.2000) (citing *United States v. Bagley,* 473 U.S. 667, 679 n. 9, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "That is, we must reverse 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *LaPage,* 231 F.3d at 491(citing *Bagley,* 473 U.S. 667 at 679 n. 9, 105 S.Ct.

3375, 87 L.Ed.2d 481, quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

By any measure, James was a key witness. There is little doubt that James' testimony was the centerpiece of the prosecution's case. Virtually all of the other evidence against Hayes was circumstantial. James was the only witness who testified that Hayes confessed to the murder and the robbery. The importance of this testimony cannot be understated. As the Supreme Court has observed:

A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . ."

*Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (quoting *Bruton v. United States,* 391 U.S. 123, 139–40, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting)).

James' testimony was critical to the death-qualifying special circumstance, namely whether the murder was committed in furtherance of a robbery. James testified that he went directly to his car without going to the office, that he did not participate in the burglary and that the stolen property had already been placed in the car by Hayes. Hayes testified that he told James that he had killed Patel, that James went to investigate, and that Hayes next saw James burglarizing the office. Hayes' version of events was corroborated by another occupant of the motel, Bearla May Wyatt, who testified that she saw James carrying things to Hayes' car, "like he was moving out of an apartment." This was a critical distinction because, under applicable California law, Hayes could be convicted of the special circumstance only if he formed the intent to burglarize or rob before striking the fatal blow. The only witness other than James who testified

that Hayes said he had burglarized the office was James' girlfriend, Michele Gebert, who provided her version of events only after she and James had discussed it for many hours, deciding what to do. Thus, given all of the circumstances, it cannot be said that the introduction of false testimony was harmless beyond a reasonable doubt.

The defense theory in closing is that James did the burglarizing. As defense counsel put it: "In this case, you can only conclude that Blufford committed a robbery or a burglary if you believe Andrew James beyond a reasonable doubt." In sum, James' testimony and credibility were crucial to the state's case.

The fact that the false evidence presented by the government dealt only with credibility does not change the materiality calculus. Noting that "[i]t is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt," the Supreme Court noted in *Napue* that:

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, to obtain a tainted conviction, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

360 U.S. at 269.

Similarly, in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court reversed a conviction for *Mooney/Napue* error because the government had failed to disclose a promise made to its key witness that he would not be prosecuted if he testified for the government. *Id.* at 154–55, 92 S.Ct. 763.

Nor does it matter that James was subject to impeachment on the basis of his transactional immunity, drug addiction and criminal record. As the Supreme Court noted in *Napue:*

> [W]e do not believe that the fact that the jury was apprised of other grounds for believing that the witness [ ] may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one.

360 U.S. at 270.

The government argues that the witness James did not know that there was a deal; therefore, the witness did not commit perjury. This contrivance was not accidental. James' attorney wrote in his notes of the conversation about the deal:

> THIS IS SECRET INFO!! *Don't tell the client,* or let the word out, or this guy will be a goner!!

In short, the state contends that no technical perjury occurred; therefore, *Napue* is not implicated. This argument plainly misapprehends the import of *Mooney, Napue,* and their progeny. It is the presentation of false *evidence* by the state that offends the constitution, not merely subornation of perjury. *Napue,* 360 U.S. at 269("[A] State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction...."); *Phillips v. Woodford,* 267 F.3d 966, 984–85 (9th Cir.2001) ("It is well settled that the presentation of false evidence violates due process.") (citing *Napue,* 360 U.S. at 269). If the state knows that evidence is false and allows its presentation to the jury, the trial has been infected with constitutional error regardless of the witness's state of mind.

We have previously repudiated such contrivances. *See id.; Willhoite v. Vasquez,* 921 F.2d 247, 251–52(Trott, J., concurring) (calling such tactics a "pernicious scheme without any redeeming features."). As we recently said in *Commonwealth of N. Mariana Islands v. Bowie,* 236 F.3d 1083, 1087(9th Cir.2001): "Few things are more repugnant to the constitutional expectations of our criminal system than covert perjury...." Thus, the state's claim of absolution based on insulating the witness from the truth is, to say the least, unavailing.

As Judge Trott wrote in *Bowie:*

The authentic majesty in our Constitution derives in large measure from the rule of law—principle and process instead of person. Conceived in the shadow of an abusive and unanswerable tyrant who rejected all authority save his own, our ancestors wisely birthed a government not of leaders, but of servants of the law. Nowhere in the Constitution or in the Declaration of Independence, nor for that matter in the Federalist or in any other writing of the Founding Fathers, can one find a single utterance that could justify a decision by any oath-beholden servant of the law to look the other way when confronted by the real possibility of being complicit in the wrongful use of false evidence to secure a conviction in court.

*Id.*

In this case, if petitioner's allegations are proven, the government knowingly presented false evidence to bolster the credibility of a material witness. Thus, I would reverse to grant an evidentiary hearing on this issue.[2]

## II

For the same reason, I would also reverse because of the state's failure to comply with the requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in disclosing the negotiated deal with witness James to the defense. "Our cases confirm that the suppression of material impeachment evidence, particularly for key state witnesses, may require the reversal of a conviction or the vacating of a sentence." *Silva v. Woodford,* 279 F.3d 825, 854 (9th Cir.2002). The information suppressed by the government was key, material impeachment evidence. I would grant an evidentiary hearing on the defendant's *Brady* claim.

## III

I would also grant an evidentiary hearing on whether Hayes was denied penalty phase effective assistance of counsel. This case comes to us in an unusual procedural posture. Hayes was not afforded an evidentiary hearing in state court in post-conviction proceedings. After the federal habeas petition was filed, the magistrate judge precluded Hayes from commencing discovery or making requests for investigative funds. The judge ordered the state to file a summary judgment motion with respect to those issues that could be decided as a matter of law. The state moved for "summary dismissal" of all claims in the complaint. The magistrate judge treated the motion as one for summary judgment, and granted summary judgment on 61 of the 63 claims. The magistrate judge held an evidentiary hearing on

---

**2.** The district court did not hold an evidentiary hearing on this issue, because it assumed that the events had occurred as alleged by the defendant. Most of the essential facts are based on sworn testimony and are undisputed. As the district court noted, the existence of the deal was "tacitly admitted" by the state in other litigation. However, I believe that an evidentiary hearing is warranted to not only confirm the allegations, but to allow the state to present an evidentiary defense, if it chooses to do so.

Hayes' claims for relief based on (1) ineffective assistance of counsel in handling a plea bargain offer and (2) Hayes' absence during the entire penalty phase of the trial. No evidentiary hearing was conducted on Hayes' claim for ineffective assistance of counsel during the penalty phase, nor was Hayes permitted any discovery on the issue. Hayes was denied any use of investigative funds to develop the claim.

"To obtain an evidentiary hearing on an ineffective assistance of counsel claim, a habeas petitioner must establish that (1) his allegations, if proven, would constitute a colorable claim, thereby entitling him to relief and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts." *Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998). There was no state evidentiary hearing on the issue, so the only issue is whether Hayes has alleged a colorable claim of ineffective assistance of counsel. As to pre-AEDPA claims, which these are, "a district court must grant a hearing to determine the validity of a petition brought under that section, '[u]nless the motions and the files and records of the case *conclusively show* that the prisoner is entitled to no relief.'" *Turner v. Calderon*, 281 F.3d 851, 890(9th Cir.2002) (quoting *United States v. Blaylock*, 20 F.3d 1458, 1465 (1994)).

Hayes alleges that his attorney did not conduct any investigation of potentially mitigating evidence and failed to present mitigating evidence during the penalty phase, which lasted only 23 minutes.

Hayes has alleged not only a colorable, but a classic case of penalty phase ineffective assistance of counsel. He alleges that his attorney failed to conduct any investigation of potentially mitigating evidence, including mental health problems, drug and alcohol abuse and addiction, and family history. Hayes contends his attorney neglected to develop and present any expert testimony in mitigation. These are paradigmatic, penalty phase ineffective assistance claims, ones upon which we have granted relief many times in the past.[3] Hayes was clearly entitled to discovery, investigative funds and an evidentiary hearing on the claim.

The United States Supreme Court has emphasized that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Williams v. Taylor*, 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In a capital trial, "[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir.1999) (quoting *Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999)). "To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.'"

---

**3.** *See, e.g., Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir.2002); *Visciotti v. Woodford*, 288 F.3d 1097, 1108–10 (9th Cir.2002); *Karis v. Calderon*, 283 F.3d 1117, 1133 (9th Cir.2002); *Silva v. Woodford*, 279 F.3d 825, 836–38 (9th Cir.2002); *Garceau v. Woodford*, 275 F.3d 769, 779 (9th Cir.2001) (Thomas, J., concurring); *Mayfield v. Woodford*, 270 F.3d 915, 927–28 (9th Cir.2001) (en banc); *Ains-* *worth v. Woodford*, 268 F.3d 868, 874 (9th Cir.2001); *Jackson v. Calderon*, 211 F.3d 1148, 1162 (9th Cir.2000); *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir.1998); *Bloom v. Calderon*, 132 F.3d 1267, 1277 (9th Cir.1997); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir.1995); *Deutscher v. Angelone*, 16 F.3d 981, 984 (9th Cir.1994); *Evans v. Lewis*, 855 F.2d 631, 636 (9th Cir.1988).

*Mayfield,* 270 F.3d at 927(quoting *Williams,* 529 U.S. at 393).

In this case, there was ample evidence in the record that Hayes suffered from long standing drug and alcohol addiction, that his behavior became violent when he was under the influence of drugs and alcohol and that he had a troubled childhood. Defense counsel had been advised that Hayes suffered from Ritalin delirium disorder. Hayes refused to attend the penalty phase of the trial because, unmedicated, he believed he was unable to control himself. There is no evidence in the record that defense counsel did any investigation of these potentially mitigating facts, nor did he develop the expert testimony on mental health which was available to him. Under our long standing prior precedent,[4] these allegations were sufficient to entitle Hayes to discovery, investigative funds and an evidentiary hearing.

The magistrate judge granted summary judgment based on his inferences about the strategy of defense counsel.[5] However, this turns the law of summary judgment inferences on its head. On summary judgment, the non-moving party is entitled to have all inferences drawn in his favor. It may well be that defense counsel's strategy was strategic. However, absent an evidentiary hearing, we cannot reach that conclusion. *Siripongs v. Calderon,* 35 F.3d 1308, 1314 (9th Cir.1994) ("[W]ithout the benefit of an evidentiary hearing ... [w]e cannot determine if counsel's decision was a strategic one, and if so, whether the decision was a sufficiently informed one.") (second alteration in original) (quoting *Hendricks,* 974 F.2d at 1109). Further, Hayes' claim is that his counsel failed to investigate potentially mitigating evidence. Absent a reasonable investigation, his counsel was not in a position to evaluate strategic choices.

The magistrate judge rejected, without discovery or a hearing, the theory that a penalty phase mental health defense would not have been successful because the psychiatrist retained by defense counsel would not have testified favorably.[6] However, the records indicate that the psychiatrist believed Hayes was in the grip of Ritalin delirium when he killed Patel. More importantly, Hayes' claim is that his trial counsel failed to prepare the expert for penalty phase testimony, and provide him with adequate information. Thus, to reject summarily this penalty phase claim on the basis that the expert was not prepared to testify favorably actually helps prove Hayes' central argument. In any event, Hayes' only needed to present a colorable claim to be entitled to an evidentiary hearing on the question. The magistrate judge erred in denying him that opportunity.

The magistrate judge also based his opinion, in part, on Hayes' direction that his family members not testify at the penalty phase. We have held that counsel's duty to investigate mitigating evidence is

---

**4.** *See supra* note 3.

**5.** "It is clear from the limited evidence presented, and clear from trial counsel's penalty phase argument, that he thought his one best strategy was to impress upon the jury the petitioner's amenability to control his violent outbursts under prison conditions...."

**6.** The magistrate judge based this, in part, on an improper reading of testimony the psychiatrist gave at the evidentiary hearing on Hayes' claim that he was improperly excluded from the penalty phase of the trial without mental examination. After ordering, *in limine,* that no expert opinions were to be given at the hearing, and that the hearing was limited to the question posed, the magistrate judge relied on an answer given on cross-examination to draw the substantive inference that the psychiatrist would not have been of assistance at the penalty phase. It was improper to make a factual finding on summary judgment based on this inference without allowing petitioner the opportunity to have a full evidentiary hearing on the issue.

"neither entirely removed nor substantially alleviated by his client's direction not to *call* particular witnesses to the stand" and that "a lawyer who abandons investigation into mitigating evidence in a capital case at the direction of his client must at least have adequately informed his client of the potential consequences of that decision and must be assured that his client has made 'informed and knowing' judgment." *Silva,* 279 F.3d at 838. Indeed, under applicable guidelines "a lawyer's duty to investigate is virtually absolute, regardless of a client's expressed wishes." *Id.* at 840. Here, no investigation was performed. *Silva* forecloses a grant of summary judgment based on client instruction. Hayes was entitled to discovery and an evidentiary hearing on the issue.

"Failure to present mitigating evidence at the penalty phase of a capital case constitutes ineffective assistance of counsel." *Bean,* 163 F.3d at 1079. Here, the penalty phase presentation was anemic, at best. Although brevity of presentation alone does not constitute ineffective assistance of counsel *per se, see, e.g., Payton v. Woodford,* 299 F.3d 815, 832 (9th Cir.2002) (Tallman, J., concurring in part and dissenting in part), it does raise significant questions. A host of mitigating evidence was available for presentation. Failure to present mitigating evidence may be excused when it is the product of a reasoned strategic choice. *Bell v. Cone,* —— U.S. ——, —— – ——, 122 S.Ct. 1843, 1853–54, 152 L.Ed.2d 914 (2002). However, the question of whether a strategic choice was made in this case is one for an evidentiary hearing, not to be decided on summary judgment on the basis of inferences.

In sum, Hayes has made a classic, colorable claim of ineffective assistance of penalty phase counsel. He was entitled to discovery, investigative funds, and evidentiary hearing on his claim.

IV

For these reasons, I would reverse the judgment of the district court. Thus, I respectfully dissent from Sections III, IV and V of the majority opinion and the judgment.